## W. R. RAY v. STATE.

No. A-4261.    Opinion Filed Oct. 4, 1924.
(228 Pac. 1005.)

(Syllabus.)

**Trial—Weight of Conflicting Demonstrative Evidence and Credibility of Witnesses for Jury.** Where the evidence is conflicting and apparently, so far as the record shows, about equally divided, and where portions of the evidence are of a demonstrative character, the weight of the evidence and the credibility of the witnesses are for the jury.

Appeal from District Court, McCurtain County; G. M. Barrett, Judge.

W. R. Ray was convicted of arson, and he appeals. Affirmed.

McPherren & Cochran, for plaintiff in error.

The Attorney General, for the State.

BESSEY, J. W. R. Ray, plaintiff in error, defendant in the trial court, was on September 21, 1921, in the district court of McCurtain county, convicted of the crime of arson, growing out of the burning of a neighbor's barn in the nighttime. By the verdict of the jury his punishment was fixed at confinement in the penitentiary for a term of 10 years.

The records and correspondence before this court show that consideration of this case has been postponed from time to time on application of the attorney representing the defendant; that the defendant is a poor person and financially unable to further prosecute this appeal and unable to pay further attorney's fees and the expense of preparing a brief in support of his appeal. Ordinarily, when no briefs are filed, this court will assume that the appeal has been abandoned; but under the circumstances in this case, without any intention of establishing a precedent in that regard, this court will undertake to brief, argue, and decide the cause on its merits, from what appears in the record.

The prosecuting witness and the defendant were neighbors, and had had a misunderstanding of minor importance concerning the gathering and sale of some cotton and division of the rents. At the market, some 40 miles distant, they failed to agree, and both drove homeward; Ray leaving on Saturday night and the prosecuting witness the following morning. On Sunday night, at about 9:30 o'clock, the barn of the prosecuting witness was discovered on fire and it burned to the ground. Earlier that evening and again at and just before 9:30 there was a severe rainstorm, accompanied by vivid flashes of lightning and loud thunder.

It was the theory of the defense that the barn was set on fire by lightning. The state contended that certain human tracks and horse tracks indicated that the barn was set on fire by the defendant, or by an accomplice of the defendant at the latter's instigation. In the examination and cross-examination of witnesses, a plat or map was used to illustrate directions, distances, and the location of these tracks. It is difficult for this court to judge of the force of some of this testimony, because this drawing was not incorporated in the record; and practically the only question involved in

this appeal is whether the evidence is sufficient to support the verdict.

The first misunderstanding between the defendant and the prosecuting witness was over the settlement for the picking of some cotton by the sons of the prosecuting witness. Defendant claimed that he was to pay for the cotton picking with corn; the boys demanded money. This difficulty, however, appears to have been adjusted to the satisfaction of all concerned before the fire.

It will be necessary to set out the testimony at some length in order to make clear the issue of whether this barn was set on fire by lightning, or whether the fire was the work of this defendant.

Mr. Helton, the owner of the barn and the prosecuting witness, testified that he lived near Bethel; that Ray, the defendant, was a crop tenant on an adjoining farm belonging to the witness; that he and defendant met at Valliant, 40 miles distant, on Saturday, the 5th day of February, 1921, for the purpose of settling for the cotton grown by defendant on witness' farm. Late Saturday evening the defendant asked Helton to wait there until Monday, as the market was off on Saturday and he wanted to wait until Monday or the early part of the week for a rise in price. Late Saturday night Helton found that the defendant had started back home. Assuming therefore that defendant would not be at Valliant on Monday, according to his agreement, early Sunday morning Helton started homeward, arriving home between 11 and 12 o'clock that night, after the barn had been practically consumed by fire. Witness was shown some human tracks in the soft earth near the barn, leading into the hallway of the barn and coming away. These tracks had been covered with boards to preserve them and prevent their being obliterated by the feet of the neighbors who had

gathered there. The tracks looked like they had been made by rubber boots. The next morning, with two neighbors, Mr. Hood and Mr. Winship, witness and his sons followed these tracks in a southwesterly course around the garden. The tracks were not very distinct on account of the rain that had fallen after they were made. The tracks led to a road beyond which they found a place where it appeared that two horses had been standing, one of which made a large track and the other a small track. These horse tracks appeared at intervals leading towards and near to where the defendant had his camp on the other farm belonging to this witness. One of the larger horse tracks had a long calk on one side—was irregular in shape. On cross-examination the witness admitted that he did not know when the human tracks were made or by whom, or at what stage of the fire they had been covered by boards; that defendant habitually drove a team consisting of a horse and a mule.

D. H. Chapman testified that he lived not far from this barn and noticed the fire at about 9:30 o'clock Sunday night; that he went to the fire and found Mr. Helton's women folks and his sons there; that the fire appeared to have started in the hallway; that he saw the tracks leading into the hallway and away from it, both ways; that he got a plank and put it over some of the tracks to preserve them; that Leonard Helton and Herbert Rye saw him cover the tracks; that these tracks led around to near where there were some horse tracks made by horses that appeared to have been standing; that there was a little patch of timber between, where no tracks could be found. Witness did not try to follow the horses' tracks. The human track looked like it was made by a rubber boot. The tracks leading into the barn looked to be those of a man walking, while those coming out were farther apart, indicating that the man was running. One of the horse tracks was of a peculiar shape, with one calk

longer than the other. The next morning following the fire the witness, with others, followed the horse tracks to very near the gate at Mr. Helton's place where Ray was staying. Witness had heard a dispute between defendant and Helton's sons about picking cotton. On cross-examination witness said that there had been rain, thunder, and lightning before and after the barn burned. When witness arrived at the scene of the fire, Ona Helton said that Ray had set the barn on fire and witness told her to hush and not accuse anybody; that it might have been set by lightning. This was before the tracks were discovered and covered with the plank.

Ellis Helton, son of the owner of the barn, says he first noticed the fire at about 9 o'clock; that the fire appeared to have started in the hallway. Chapman called the witness' attention to the tracks. That it rained about dark that night, before the fire. Witness verified the testimony as to the horses' tracks leading over towards the defendant's camp, about a mile distant. He also stated that the human tracks appeared to have been made with a rubber boot.

Jess Hood, a deputy sheriff, examined the human tracks covered by a plank, also followed the horses' tracks, one of which was peculiar. Witness followed the horse tracks, as best he could, to near a field where defendant was. Near there in a barn witness and others found the horse belonging to Ray which made the peculiar track. That afternoon witness arrested Ray, who was wearing rubber boots corresponding in size and shape with the tracks covered by the plank. There were five other horses in the field. Ray was riding a pony when witness arrested him.

For the defense, W. F. Redding testified that he lived about 1½ miles from Helton's barn when it burned; that there was a terrible electrical storm that night, with heavy

thunder and lightning, commencing a little before 9 o'clock; that he and his family went into the storm cave on their place for protection before 9 o'clock. When they came out of the storm cave witness noticed the light from the burning barn. There had been a hard storm earlier, and another followed at about 10 o'clock.

J. F. Cheek lived one mile from the Helton barn; saw the light from the burning barn and started to go to the fire, but could not cross the swollen streams. Just before the barn burned there was a rainstorm, with heavy thunder and vivid lightning. While the barn was burning the thunder and lightning continued, then ceased, and later there was another electrical storm. Witness went to the Helton place the next morning, where he was shown tracks covered by a board, some 12 or 15 steps from the barn; the tracks looked as if they had been made by a shoe, a course work shoe; didn't look like rubber boot tracks at all.

Bernie Cheek saw the light of the burning barn; it had been thundering, with flashes of lightning. Witness could not go to the place because of swollen creeks. While the barn burned, the thunder and lightning continued. The next afternoon the tracks were shown to witness. These tracks were about 15 steps from the barn hallway. Witness thought they looked like shoe tracks.

Isaac Winship was at the place where the barn burned the day following the fire. He stated that he and others attempted to do some tracking; saw the track covered with a board, and it appeared to be a shoe track, about a number eight shoe. Some dim horse tracks were pointed out to witness, but he could not follow them through brush and swags; he could discern no peculiarities about these tracks. Nothing was said about any peculiar tracks at or before that time. Officer Hood found the horse he said was supposed to have

made the tracks and led him onto plowed ground, where he made distinct tracks, and witness saw no peculiarities about those tracks. Witness was with Officer Hood when he arrested Ray. Hood first measured the foot of the young man who was with Ray, later Ray's foot. He put a stick back of his heel and pushed it up in front; Ray was on his pony at the time, and Ray stuck his foot out for Hood to measure it. Witness did not see just exactly how he did it.

Sherman Ethridge was at the scene of the fire on the morning following the fire. Witness was shown the tracks that had been covered with a plank; could not tell whether they were made by a boot or a shoe. They also pointed out horse tracks. One of the front feet of one horse made a kind of oblong track. These tracks did not lead to the field where Ray was camped, but near there. Officer Hood told us to stay there.

W. R. Ray, the defendant, testified that a short time before the barn burned he was living on Helton's farm, about one mile distant from Helton's home place, but that at the time of the fire he was camped at another place about two miles away. Concerning the friction with the Helton boys, the defendant testified as follows:

"His sons got a little angry with me because I wouldn't pay them money for cotton picking when I had a fair agreement with their father to pay in corn, and these boys wanted me to pay them money. I told them I had agreed to pay their father a bushel of corn for a hundred pounds of cotton. I had three bales of cotton then, and one of the boys jumped up and said, 'We are going to attach your cotton then.' I says: 'Boys, you will go in the hole if you do that; me and your papa had a fair and square agreement.' Then the other one jumped up and he says, 'I will just get a hand full of him.' Then Uncle Pete says, 'Don't have any trouble,' and I just says, 'I aint going to have any trouble,'

and I just drove on outside and got down and shut the gate and drove on off. That was on Monday, and I went on to town and back, and Thursday he says, 'Let's weigh the corn.' I says, 'All right, and what corn I lack I have made arrangements with Mr. Croy just across the creek to get the rest of the corn.' So we went over there and weighed the corn up.''

Concerning the sale of the cotton in town and the division of the proceeds, the defendant testified:

''That day (Saturday), when I got to Valliant, they was waiting for me to come in with my cotton. I carried five bales, and when I got there Helton says, 'Are you going to sell now?' I says, 'I've got four more bales, and when I sell I want to get the top price.' He says, 'I want to sell mine.' I says, 'Go ahead and sell the fourth if you want to.' We talked awhile, and I went on up the street, and there was a cotton buyer come along, and he says, 'Mr. Helton says you won't sell your cotton.' And I says, 'His fourth is there for him to sell; when I get ready to sell mine I will sell mine and he can sell his.' I says, 'We will try and sell some next week if the market goes up.' I had sixteen bales there and four at home. I had altogether twenty-eight bales, but I had sold some.''

Defendant says he told Helton he would go home and finish moving and sell the cotton the week following, or as soon as the market got better; that he arrived home at about sundown; that it was raining when he reached home, that he went to bed at about 9 o'clock; in the meantime it was thundering and lightning; that his nephew and his son were with him at home all that night. Defendant first learned of the burning of the barn from a neighbor, Harris, the next day about noon. Concerning his arrest the defendant testified:

''When I met Hood, we just stopped and set there and talked a little bit. I says: 'Well, it's getting late. You fellows better go back and stay all night with me. He says,

'No. I've got a flim-flam to talk with you.' I says, 'All right, go to it.' He says, 'Stick your foot out here,' and I stuck my right foot out just like that (demonstrating), and he measured it and looked over at Isaac and winked, and he measured it again, and I did, and it lacked just that much (indicating) of going across my boot. It lacked just about the width of my thumb. My boot was right smart longer than the stick he had. He said he was trying to find the man that burned Mr. Helton's barn. I says, 'You will have to go somewheres else.' Then he asked me about where my nephew was. He says, 'Do you know whether your nephew left the house?' and I says, 'If he left at all, it was after I was asleep.' "

Later Hood searched the defendant's house. Defendant asked him what he was trying to find, and Hood said: "I was looking for a pair of shoes. I didn't know but what maybe you bought a pair at Valliant and had them hid." On cross-examination: If any of defendant's horses made a peculiar track, defendant did not know it. Defendant was wearing a rubber boot when arrested. Defendant admitted he had served a term in the penitentiary in Arkansas for manslaughter.

The question now confronting this court is: Does this evidence beyond a reasonable doubt exclude every reasonable hypothesis except the guilt of the defendant? The evidence of seemingly disinterested witnesses concerning the human tracks was indefinite as to whether they appeared to have been made by a shoe or a rubber boot; the horse tracks were not continuous, and the peculiarity of the track made by the front foot of one animal was such as might have been made by another animal. The fact that there was a severe electrical storm, with much sharp lightning and heavy thunder, just preceding the fire, might reasonably raise an inference that the barn might have been struck by lightning and thus fired. All these, however, were questions of fact for

the jury. There was evidence of motive which, coupled with circumstantial and demonstrative evidence submitted, pointed to the guilt of the defendant. The weight of the testimony and the credibility of the witnesses was for the jury.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.